In re Bobby Gene COX and Verna Jean Cox, Debtors.

HERITAGE FEDERAL CREDIT UNION, as Successor in Interest to Knox County School Employees Credit Union, Plaintiff,

v.

Kimberly K. COX, Bobby Cox, Verna Cox, B.J. Bellemey, Edward B. Beasley, Dean L. Johnson, d/b/a D & E Investments, and Unknown Owners, Defendants.

Bankruptcy No. 91–82729.
Adv. No. 91–8213.

United States Bankruptcy Court,
C.D. Illinois.

Dec. 12, 1994.

Francis Van Hooreweghe, John P. Harris, Moline, IL, for Heritage Federal Credit Union.

Barry M. Barash, Galesburg, IL, for Cox defendants.

## OPINION

WILLIAM V. ALTERNBERGER, Chief Judge.

This case is before the Court on remand from the Honorable Michael M. Mihm, Chief United States District Judge for the Central District of Illinois.

The Debtors, BOBBY GENE COX and VERNA JEAN COX[1], filed a Chapter 13 bankruptcy petition on November 25, 1991, but the controversy underlying this dispute did not begin there. Back in 1985, the DEBTORS began residing at a house located at 404 West Lower St., Abingdon, Illinois. According to BOBBY GENE COX's testimony, when he mentioned to his son's father-in-law, Robert Williams, (WILLIAMS) that he liked the residence, WILLIAMS suggested that WILLIAMS buy the residence and that BOBBY GENE COX could make the mortgage payments. WILLIAMS purchased the residence and title remained in his name. The DEBTORS furnished the down payment and paid the real estate taxes and insurance. The DEBTORS made the mortgage payments for a period of about two years.

Their son's marriage fell apart, however, and WILLIAMS threatened to sell the residence. The DEBTORS could not borrow the money from the Knox County School Employees Credit Union (CREDIT UNION), because they would exceed the CREDIT UNION's internal lending limits. At the suggestion of the CREDIT UNION's then manager, WILLIAMS conveyed title to the residence to Kimberly Kaye Cox (KIMBERLY), the DEBTORS' daughter, and the loan

---

1. BOBBY GENE COX and VERNA JEAN COX will be referred to collectively as the "DEBT-ORS", and individually by their full names.

from the CREDIT UNION was made in her name. As part of the loan transaction, KIMBERLY gave the CREDIT UNION a first mortgage on the residence which waived homestead interests. The DEBTORS continued to live in the home, paying the taxes and insurance and making the mortgage payments to the CREDIT UNION.

KIMBERLY filed a Chapter 7 petition in bankruptcy on February 22, 1989. The Chapter 7 Trustee filed a two-count complaint against the CREDIT UNION, alleging violations of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., seeking statutory damages and rescission. In In re Cox, 118 B.R. 94 (Bkrtcy.C.D.Ill.1990), this Court determined that the annual percentage rate disclosure was inaccurate and granted judgment in favor of the Trustee. This Court also held that the Chapter 7 Trustee was not entitled to rescind the mortgage, because the residence was not KIMBERLY's principal residence. Though the Trustee had added the DEBTORS as Defendants in that action and obtained service, the DEBTORS never filed a responsive pleading.

The CREDIT UNION then filed a foreclosure complaint in state court on August 28, 1991, naming KIMBERLY and the DEBTORS as Defendants, seeking a deficiency judgment only against the DEBTORS. KIMBERLY and the DEBTORS answered the complaint, with the DEBTORS alleging as an affirmative defense that they had no personal liability because they did not sign the note. The DEBTORS asserted a counterclaim, seeking statutory damages for an inaccurate disclosure of the annual percentage rate and rescission of the transaction. The CREDIT UNION filed a motion to dismiss the counterclaim and on November 4, 1991, the counterclaim was dismissed by the state court with the DEBTORS being given leave to replead.

Instead of repleading, the DEBTORS filed a Chapter 13 proceeding in bankruptcy on November 25, 1991, and had the foreclosure proceeding removed to this Court as an adversary proceeding. The CREDIT UNION moved for abstention and remand to the

state court. This Court denied the CREDIT UNION's motion, and the appeal taken by the CREDIT UNION from that decision was dismissed by the District Court in July, 1992, as a premature, interlocutory appeal.

The DEBTORS' Chapter 13 plan provided that the DEBTORS would pay the Chapter 13 Trustee $78.00 every other week for a period of three years, totalling $5,616.00. Under the terms of the plan, priority creditors, totalling $1,798.00 were to be paid first, with payment of the balance due on attorney's fees of $800.00 being paid next. The DEBTORS' plan then proposed to pay the secured claim of the CREDIT UNION on a vehicle in the amount of $300.00. The DEBTORS' plan provided the following with respect to the mortgage held by the CREDIT UNION and the pending adversary proceeding:

Debtors have alleged that the credit union is entirely unsecured, claiming violations of the Truth in Lending Act. They have removed the credit union's foreclosure action from state court to this court; the credit union has moved to remand.

If the court finds that the credit union is entirely unsecured, then debtors do not propose to pay the credit union anything on the mortgage note. However, if the court finds that the credit union's mortgage is valid, then debtors intend to pay the fair market value of the real estate at 404 W. Lower, Abingdon, Illinois, to the credit union at the rate of $200 per month, outside the plan, which amount includes interest at 9%.

At the time of the filing of the Chapter 13, BOBBY GENE COX was unemployed and the schedule of current income showed a combined monthly income, strictly from wages of VERNA JEAN COX of $1,314.00. The schedule of current expenditures showed total monthly expenses of $1,314.00, including a $200.00 monthly mortgage payment to the CREDIT UNION and a monthly payment to the Chapter 13 Trustee of $156.00. The DEBTORS listed unsecured claims in the amount of $11,043.00 [2] and the dividend to unsecured creditors was estimated to be 6%.

2. This amount does not include the unsecured component of the CREDIT UNION's claim, estimated by the DEBTORS at $16,000.00.

The CREDIT UNION filed an objection to the plan, raising the additional objection that § 1322(b)(2) of the Bankruptcy Code, 11 U.S.C. § 1322(b)(2), prohibits the modification of a secured claim secured only by a security interest in real property that is the debtor's principal residence [3] and, while the appeal was still pending before the District Court, a confirmation hearing was held on April 10, 1992. The DEBTORS assured the Court that the alternatives set forth in the plan covered all the bases and that the pending litigation in the adversary proceeding posed no bar to confirmation. The CREDIT UNION indicated that confirmation of the plan should not be construed to be a concession by the CREDIT UNION as to any issues raised in the adversary proceeding. The DEBTORS stated that they just wanted to be able to make the regular payments to the other creditors. At the Court's invitation, the parties submitted an agreed order confirming the plan which was entered on May 19, 1992.

KIMBERLY and the DEBTORS then moved to amend their answer, affirmative defenses and counterclaim, to reflect that on March 11, 1992, KIMBERLY deeded the residence to the DEBTORS. That motion was denied by the Court. A pretrial conference was held on the adversary proceeding and the Chapter 13 Trustee's objection to the claim filed by the CREDIT UNION on February 9, 1993. The CREDIT UNION asserted that it had a right to foreclose the mortgage because KIMBERLY was the borrower and the title holder at the time the note and mortgage was executed. The CREDIT UNION also contended that the DEBTORS were not entitled to any of the protections of the Truth in Lending Act because they were not the borrowers and that they may not maintain an action under that law because they are not the title holders. The DEBTORS contended that KIMBERLY's liability on the note had been discharged by her bankruptcy and that the CREDIT UNION had no claim against the

DEBTORS because they did not sign the note. Relying on *Shay v. Penrose*, 25 Ill.2d 447, 185 N.E.2d 218 (1962), the DEBTORS maintained that they were the owners of the residence. The DEBTORS took the position that they were entitled to rescind the transaction and to statutory damages for the CREDIT UNION's failure to give them the required disclosures under the Truth in Lending law. On the eve of trial, the CREDIT UNION filed a motion to dismiss the affirmative defenses and the counterclaim for rescission, asserting that those actions were time-barred.

A trial of all issues was held on July 16, 1993. No mention was made of the DEBTORS' claim to a homestead exemption and, in fact, it was admitted during argument following the close of the evidence, that if the Court would find the mortgage to be valid that the DEBTORS would have to pay the mortgage balance in full. Post-trial briefs were filed by the parties. In their post-trial brief the DEBTORS for the first time claimed they were entitled to a homestead exemption. This Court issued its opinion and order on December 29, 1993, holding that the DEBTORS could treat the CREDIT UNION's claim in their Chapter 13 proceeding, and that the DEBTORS must pay 100% of the CREDIT UNION's secured claim. This Court ruled in favor of the CREDIT UNION on the DEBTORS' claims for rescission and statutory damages under Truth in Lending.

In its prior Opinion, this Court remarked upon the peculiar facts and posture of the parties throughout this case, stating:

> These oddities are easily explainable. The loan was in reality for the benefit of the DEBTORS. Prior to the loan the DEBTORS resided in the residence. The loan was structured in the manner that it was because the DEBTORS did not qualify for a loan. Both the CREDITOR and the DEBTORS participated in the charade.

**3.** After the filing of the objection by the CREDIT UNION and prior to this Court's opinion issued December 19, 1993, the United States Supreme Court issued its decision in *Nobelman v. Ameri-can Sav. Bank*, ___ U.S. ___, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), prohibiting bifurcation of the claim of a mortgagee secured only by a mortgage on the debtor's principal residence.

After the loan was made, the DEBTORS continued to reside in the residence and they made the loan payments. The parties' actions reflect the true nature of the transaction. In reality the residence belonged to the DEBTORS. The legal theory supporting their position is one of a resulting trust. *See Matter of Torrez,* 63 B.R. 751 (9th Cir. BAP 1986).

The DEBTORS filed a motion to reconsider, asserting that this Court had failed to address the DEBTORS' claim of homestead. In their post-trial brief, the DEBTORS, relying on a number of early Illinois decisions, argued that a homestead estate can be waived or extinguished only by one of the methods proscribed by statute and that the doctrines of estoppel and laches do not effect a release of homestead. A hearing was held on the motion to reconsider on February 11, 1994. The CREDIT UNION took the position that the waiver of homestead in the mortgage executed by KIMBERLY was binding on the DEBTORS. This Court summarily denied the DEBTORS' motion to reconsider, and the DEBTORS filed an appeal.

The District Court issued its decision on the appeal on July 6, 1994, affirming this Court's decision in part, and remanding it in part. The District Court affirmed this Court's ruling on the Truth in Lending claims asserted by the DEBTORS, but remanded the case to this Court for a determination whether a homestead estate exists with respect to the DEBTORS, whether the DEBTORS waived their homestead estate if one in fact existed, and to give this Court an opportunity to clarify its discussion regarding a resulting trust. This Court does not have a record of the proceedings on appeal before the District Court and no further hearings or arguments have been held or heard before this Court on remand.

On appeal, the DEBTORS apparently made much of this Court's reference to a resulting trust, arguing that this Court made a factual determination that a resulting trust was established. The District Court questioned that contention, noting this Court's failure to cite any Illinois case law and suggested that instead this Court was simply explaining the DEBTORS' legal theory. The

District Court stated that this Court could avail itself of the opportunity to clarify the issue on remand.

This Court did not premise its ruling that the DEBTORS could include the claim of the CREDIT UNION in their Chapter 13 proceeding upon the factual determination that a resulting trust was established. Rather, this Court discarded the legal charade engineered by the parties and gave effect to the true essence of the parties' relationship, without resort to any specific legal theory. Faced with the wide range of problems which arise out of the cases which come before them, bankruptcy courts have always invoked equitable powers to insure that substance prevails over form to prevent fraud or injustice. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Matter of Imperial Heights Apartments, Ltd.,* 18 B.R. 858 (Bkrtcy.S.D.Ohio 1982).

██ The law in Illinois on resulting trusts is quite clear. In *Suwalski v. Suwalski,* 40 Ill.2d 492, 240 N.E.2d 677 (1968), the court stated:

[A] resulting trust arises by operation of law, based on the presumed intention of the parties. *First National Bank and Trust Co. v. Illinois National Bank and Trust Co.,* 19 Ill.2d 385, 388, [167 N.E.2d 223]; *West v. Scott,* 6 Ill.2d 167, 172, [128 N.E.2d 734]. This trust arises typically when land is purchased with the money of one party and title is taken by another and hence it is presumed that title is held in trust for the purchaser. (*See West v. Scott,* 6 Ill.2d 167, [128 N.E.2d 734]; *Wright v. Wright,* 2 Ill.2d 246 [118 N.E.2d 280]; *Bowman v. Pettersen,* 410 Ill. 519 [102 N.E.2d 787].) The fact that money is paid directly to the grantor by the person taking title does not prevent a resulting trust from arising, if it is the intention of the parties that the money is paid for or on behalf of another, that is, the beneficiary. To determine whether such was intended we must look to the conduct of the parties. *First National Bank and Trust Co. v. Illinois National Bank and Trust Co.,* 19 Ill.2d 385, 388 [167 N.E.2d 223].

The imposition of a resulting trust most often involves a dispute between the title holder and the claimant who has furnished the consideration for the property. Here, the dispute involved only the DEBTORS and the CREDIT UNION whose then manager suggested a method of avoiding the CREDIT UNION's internal lending limits. KIMBERLY testified that she had no interest in the residence and participated in the transaction at BOBBY GENE COX's behest and never considered herself to be the owner. Though KIMBERLY signed the note to the CREDIT UNION she never made any payments on the loan. As between KIMBERLY and the DEBTORS, there is no dispute that the requirements for the imposition of a resulting trust were met and the CREDIT UNION should not be permitted to thwart that result, given its then manager helped to perpetrate the scheme.

The CREDIT UNION argues that a resulting trust did not arise because the loan was made to KIMBERLY and the DEBTORS did not pay any part of the purchase price. The CREDIT UNION is incorrect. In *Wright v. Wright*, 2 Ill.2d 246, 118 N.E.2d 280 (1954), the defendant's mother, unable to obtain a loan to purchase a rooming house, convinced her son to obtain a G.I. loan and take title in his name. The transaction was completed and the mother operated the rooming house for a number of years, making payments on the loan. While the defendant resided there from time to time, he never assisted her in its operations nor did he make any mortgage payments. Later, the defendant returned and attempted to oust his mother, asserting ownership of the rooming house. The facts of that case are indistinguishable from the present case, and the court's conclusions apply here as well:

> Summarized, the situation is that plaintiff desired to buy the property in order to continue operating it as a rooming house. Unable to finance its purchase, she asked her son to obtain a loan from the Veterans' Administration. He agreed upon the express understanding that while title would be taken in his name his mother would make the payments on the loan. Defendant was not interested in buying the house or in making the necessary payments on the mortgage indebtedness incurred to finance the purchase. Apart from title being taken in defendant's name the transaction differs but little, if at all from the typical situation in which one person advances the funds for the purchase of property and title is taken in another. Defendant was the purchaser in name only.

> Uncontradicted evidence establishes that at no time during the negotiations incident to the sale and conveyance was there any intention manifested by either plaintiff or defendant that the latter should have any beneficial interest in the property. Indeed, defendant never challenged his mother's ownership until domestic discord developed five years later. The mother initiated the negotiations with [the seller] and pursued them to a conclusion. Title was taken in the son's name for the convenience of his mother and for her sole benefit. Economic necessities motivated the form of the transaction; without the G.I. loan, the property could not have been purchased. Title was taken in defendant's name and he signed the contract for sale, the mortgages and the mortgage notes as a means of extending credit to plaintiff. In form, the son was the purchaser and the mortgagor; in substance the mother was the purchaser and the mortgagor. The transaction in reality was in the nature of a loan from defendant to plaintiff of funds borrowed by defendant. The transaction fairly admits of the construction that defendant's title was necessary to accomplish his borrowing and was operative to secure him as to his loan to plaintiff.

In holding that the mother established a resulting trust in the property, the court continued:

> It is recognized that the payment of money by a transferee may constitute a loan to another for whose benefit a resulting trust will be raised. 3 *Scott on Trusts*, sec. 448, says: "If a person pays the purchase price for a conveyance made to himself, it would seem at first blush as if there would be no ground for imposing a resulting trust. But suppose that the payment is made not for himself but for another.

Suppose that B lends money to A in order that A may purchase land from X, but B pays the purchase money directly to X and takes title in his own name. It is true that in that case the money which was advanced by B never actually belonged either legally or equitably to A. Just before B paid it over to X, the money belonged to B; just after B paid it over to X, the money belonged to X. There were not two separate transactions in which B first lent the money to A, and A subsequently paid it over to X, in which case it would have been clearly A's money which was paid to X. The courts have rightly held, however, that it is immaterial that the loan to A and payment to X constitute a single transaction. A loan may be made in other ways than by handing the money over to the borrower. It may be made by paying it to another at the borrower's request. Hence although B pays the purchase money directly to X, yet in substance it is A's money, being lent to A by B. There is therefore a resulting trust for A. B, however, having taken the title as security for the repayment of the loan to A, cannot be compelled to convey the land to A unless and until A pays B the amount of the loan. A's equitable interest by way of resulting trust therefore is subject to B's security interest."

Accordingly, this Court now finds that a resulting trust arose in favor of the DEBTORS when the property was conveyed to KIMBERLY.

■ Having determined that a resulting trust did arise, this Court will now consider the issue which the District Court, in remanding the case to this Court, directed this Court to determine. The District Court directed that this Court make the factual determination whether the oral contract for deed agreement between WILLIAMS and the DEBTORS created a homestead estate in the DEBTORS.[4] It did. BOBBY GENE COX testified that the DEBTORS furnished the down payment, WILLIAMS bought the property, and the DEBTORS made the mortgage payments directly to the mortgagee and paid the taxes and insurance. Illinois courts have held that the interest of a purchaser in possession of property under an executory contract for sale entitles the purchaser to claim an estate of homestead. *Kilmer v. Garlick*, 185 Ill. 406, 56 N.E. 1103 (1900); *Cochran v. Cutler*, 39 Ill.App.3d 602, 350 N.E.2d 59 (2d Dist.1976). That the agreement in this case was oral and not written should not cause a different result.

■ The next issue to be determined is whether the DEBTORS' homestead interest was waived. The CREDIT UNION argued that KIMBERLY was acting as the DEBTORS' agent in the transaction with the CREDIT UNION and that her waiver of homestead is binding on the DEBTORS. Relying on the Illinois statute pertaining to the release of homestead, which provides in part as follows:

No release, waiver or conveyance of the estate so exempted shall be valid, unless the same is in writing, signed by the individual and his or her spouse, if he or she have one, or possession is abandoned or given pursuant to the conveyance.

Ch. 110 IRS § 12–904 (1987).

The DEBTORS maintain that they have a right of homestead which remains unreleased and that there can be no waiver by another of one's homestead rights.

Courts normally regard homestead rights as inviolable. In *Matter of Smith*, 966 F.2d 973 (5th Cir.1992), the debtors obtained a loan from the bank, executing false documents to make it appear the loan proceeds were to improve their residence, while the money was actually being advanced to pay delinquent taxes and other debts. The debtors executed a mechanic's lien contract and note which were assigned by the contractor to the bank. The debtors defaulted, the bank failed and the assets of the bank were later assigned to a second bank by the FDIC.

---

4. The homestead issue was raised not by a pleading filed before the trial, but after the trial by the DEBTORS' post-trial brief. In this Court's view, as later discussed in this Opinion, that is too late. The District Court did not directly address the timeliness of the DEBTORS' assertion of their homestead rights and this Court will rule on the homestead issue in accordance with the direction on remand from the District Court.

In an action brought by the second bank in the debtors' Chapter 11 proceeding to determine the validity of the lien, the debtors argued that the lien never attached to their homestead because the improvements called for by the contract were never made. Ruling that the debtors were estopped from denying the validity of the lien because the second bank was an innocent third party purchaser of the mechanic's lien note and contract, the court commented, in *dicta*, on the probable result as between the debtors and the first bank:

> There is little doubt that the FDIC, and subsequently the Bank, were deceived by the [debtors'] loan file. Indeed, the bankruptcy court specifically found that the [debtors], [the contractor], and [the first bank] entered into this transaction to defraud federal banking authorities. The [debtors] clearly represented within the bank records, by means of the mechanic's lien note and contract and the three draw orders, that the work on the homestead was taking place, and thereby induced the FDIC to invest funds for the note and contract in the purchase and assumption transaction. The [second bank], as assignee of the FDIC, was similarly misled by the [debtors'] representations as to the validity of the mechanic's lien.

> The [debtors] contend, however, that estoppel is improper in this case because the initial assignee of the note and contract, [the first bank], was not an innocent third party purchaser, because it was found by the bankruptcy court to have full knowledge of the fraud. We recognize that, based upon [the first bank's] knowledge of the fraud, the [debtors] would probably not be estopped from asserting the invalidity of the mechanic's lien if it were still held by [the first bank.] The lien note and contract are no longer held by [the first bank], however, and are now in the possession of a subsequent assignee. This subsequent assignee, the [second bank], was not a party to the creation of the fraudulent lien. Indeed, the [second bank] (and its assignor, the FDIC) took the lien note and contract in good faith, for value, and without knowledge of the fraud, and was therefore an innocent third party purchaser.

Another case involving a similar sham transaction is *Matter of Rubarts*, 896 F.2d 107 (5th Cir.1990). There, the debtors needing funds to develop other property, but unable to obtain a loan through their corporation because the assets were heavily encumbered, transferred their homestead to the corporation. The corporation obtained a loan from the bank, granting the bank a security interest in the residence. The debtors caused the corporation to reconvey the residence to them and they continued to reside there until they filed bankruptcy, claiming the homestead as exempt. Reversing the decision of the district court that the debtors were not entitled to a homestead exemption, the court found that the bank had constructive knowledge of the debtors' plans to reconvey the property:

> For example, Bobby Rubarts testified that when he first approached the loan officer, Eddie Shadden, proposing to obtain a second mortgage loan on the house to obtain development money for the corporation, Shadden initially said he was not sure that could be done. Shadden's testimony was not to the contrary: He testified that Rubarts "wanted to refinance the indebtedness against his home, which we were very quick to tell him under the laws of the State of Texas that we would not be able to do that because of the Homestead Law.... It was at that point that he asked if it would be permissible to borrow money in the name of his corporation."

> It is evident that this meeting was held in the context of a longstanding relationship between the [debtors] and the [bank]. They had known the bank officers for many years, and the institution was well aware of their business affairs. It is undisputed that the [debtors] occupied the house as their only residence during the period in question, and there is no suggestion that this fact was ever concealed or was ever less than obvious in the eyes of [the bank] or any other party. Nor is there even an assertion that the [debtors] ever hinted at moving from the residence during the relevant period. It was stipulated that the residence was continuously insured in the [debtors' (not their corpora-

tion's)] name and that [the bank] was named as the mortgagee and loss payee in the policy. It is reasonable to infer that [the bank] either received copies of such policy or easily could have obtained the same.

Reaching its conclusion in a somewhat reluctant manner, the court stated:

Principles of federalism strictly define the scope of our powers of review in a case such as this one; our sole duty is to determine, to the best of our ability, what the state law is and to apply it. The task requires restraint, for we must guard against temptations to substitute our own policy choices for those of the state legislature. Like Judges Politz and Jolly, both of whom specially concurred in [*In re*] *Niland*, 825 F.2d [801] at 816–17 [ (5th Cir. 1987) ], we express some uncertainty as to whether the disposition of this case is the fair and just one: We are hesitant to declare a lien unenforceable in the fact of what is most charitably called a "double-cross."

Nevertheless, we harbor no uncertainty as to the result that is required by Texas homestead law: In Texas a lender who is aware of the claimant's continued, actual possession of the property bears a heavy burden in its attempt to escape the reach of the state's homestead provisions. The people of Texas, through their constitution, have determined that in circumstances such as those presented here, debtors may enjoy the benefits of the homestead laws even where they employ devices designed to defeat the purposes of those laws. We have no warrant to second-guess that matter of public policy.

Illinois courts, like those of Texas, are similarly protective of homestead rights and have long held that an estate of homestead can be waived or extinguished only by one of the methods prescribed by statute. *Imhoff v. Lipe*, 162 Ill. 282, 44 N.E. 493 (1896); *Holterman v. Poynter*, 361 Ill. 617, 198 N.E. 723 (1935); *Leonard v. Crane*, 147 Ill. 52, 35 N.E. 474 (1893). Moreover the doctrines of estoppel and laches have been held inapplicable to homestead claims. *Dixon v. Moller*, 42 Ill.App.3d 688, 356 N.E.2d 599 (5th Dist.

1976). However, none of the cases cited by the parties or discovered by this Court's own research involve either the unique facts in the case before this Court or the legal theories advanced to establish and protect the homestead rights.

 A bankruptcy court is a court of equity. *Securities & Exchange Comm. v. United States Realty & Improvement Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940). One who seeks equity must do equity. *U.S. v. Wilson*, 707 F.2d 304 (8th Cir. 1982); *Local 478 Trucking and Allied Industries Pension Fund v. Jayne*, 778 F.Supp. 1289 (D.N.J.1991). This equitable maxim, is intertwined with the doctrine of "unclean hands," which denies equitable relief to a party whose conduct in connection with the matter at issue involves fraud, bad faith or unconscionability. *In re Cupples Farms*, 128 B.R. 769 (Bkrtcy.E.D.Ark.1991). As presently applied, the doctrine simply means that the plaintiff's wrongdoing may be relevant to the remedy the plaintiff is entitled to. *Shondel v. McDermott*, 775 F.2d 859 (7th Cir. 1985). The imposition of a resulting trust is an equitable remedy. *In re Foam Systems Co.*, 92 B.R. 406 (9th Cir. BAP 1988), *aff'd without written opinion*, 893 F.2d 1338 (9th Cir.1990). It is the DEBTORS who sought relief in this Court, by the filing of their bankruptcy petition and this adversary proceeding. It is the DEBTORS that invoked the equitable remedy of a resulting trust, yet they want to escape the legal effects of the mortgage which included a waiver of homestead and was an integral part of, or driving force for, the transaction. While it is true that the DEBTORS did not defraud or mislead the CREDIT UNION, the DEBTORS cannot "eat with the hounds and run with the hares." *In re Crockett*, 3 B.R. 365 (Bkrtcy. N.D.Ill.1980). The DEBTORS cannot split the transaction by relying on what is favorable to them and rejecting what is unfavorable to them. If the DEBTORS are the true owners, the mortgage and waiver of homestead is binding on them as well.

 Moreover, there is a procedural reason why the DEBTORS should not be permitted to claim a homestead exemption. An issue raised for the first time in briefs

filed after trial is not timely raised. *National Assn. of Life Underwriters, Inc. v. Commissioner of Internal Revenue*, 30 F.3d 1526 (D.C.Cir.1994). When confronted with a new issue in a post-trial brief, the issue is not properly developed and the opposing party has no opportunity to respond with evidence. *In re Facility Systems, Inc.*, 101 B.R. 519 (N.D.Ill.1989). Without further hearing and affording the opposing party an opportunity to meet the challenge, any determination by the trial court as to prejudice by the opposing party is necessarily infused with an element of speculation. This rule is particularly applicable in Bankruptcy Court where the swift adjudication of disputes benefits both debtors and creditors. *In re Monetary Group*, 159 B.R. 964 (M.D.Fla.1990); *In re Kidd*, 142 B.R. 238 (Bkrtcy.S.D.Ohio 1992). The DEBTORS' claim of homestead was not raised by any pleading in, or during the trial of, this adversary proceeding. The plan filed by the DEBTORS provides that they intended to challenge the CREDIT UNION's mortgage and pay the CREDIT UNION only if its mortgage was upheld. The plan limits the challenge to the mortgage to alleged truth in lending violations. Those were the issues framed by the parties and tried to the Court. While proclaiming not to address any issues not specifically identified in the joint pretrial statement or by the court itself, the DEBTORS, in their post-trial brief, stated, quite disingenuously, that they claimed the homestead exemption in their schedules. It is true that the DEBTORS' schedule of exempt property reflects that they claimed their interest in equity value up to the maximum allowable amount of $15,000.00, but no assertion was made that their homestead claim was superior to the claim ·of the CREDIT UNION. To now argue that the pro forma assertion of the homestead exemption, buried in the bankruptcy petition, actually raised the issue currently being argued and preserved it throughout this litigation is ludicrous. The purpose of the schedule of exempt property in a Chapter 13 case is only to assist creditors and the court in making the liquidation analysis. *Security Bank of Marshalltown, Iowa v. Neiman*, 1 F.3d 687 (8th Cir.1993).

In issuing its Opinion and Order on December 29, 1993, this Court declined to rule upon the DEBTORS' untimely raised claim of homestead, and the DEBTORS filed a motion to reconsider. Motions to reconsider are intended to serve a limited function. A motion to reconsider is appropriate only when the court has obviously misunderstood a party's position or the facts or applicable law, or when the party produces new evidence that was unavailable at an earlier time. *Fidelity State Bank, Garden City, Kan. v. Oles*, 130 B.R. 578 (D.Kan.1991). None of those exceptions were applicable here.

This procedural bar to raising the claim of homestead is not meaningless, to creditors, including the CREDIT UNION. The DEBTORS filed their Chapter 13 bankruptcy nearly three years ago and their plan as to all other creditors is now a fait accompli, paying unsecured creditors only $2,456.00 or approximately 6% of their claims. One factor to consider in determining whether to object to confirmation is whether all a debtor's disposable income was going to creditors. The DEBTORS' plan was confirmed based upon the fact all their disposable income was going to creditors based upon $200.00 per month going to the CREDIT UNION unless the mortgage was set aside because of a truth in lending violation. If creditors had been aware of the homestead claim and felt there was merit to the DEBTORS' position they could have objected to confirmation on the grounds the $200.00 per month should be considered disposable income if not being paid to the CREDIT UNION. The CREDIT UNION could have made a similar analysis. If its mortgage was invalidated by the DEBTORS' homestead claim, it would have an unsecured claim and would want all disposable income going to unsecured creditors. While the DEBTORS might invoke the "no harm, no foul" rule, and contend that unsecured creditors would receive no less whether the mortgage was invalidated on truth in lending grounds or by the DEBTORS' claim of homestead, that result would impugn the reorganization process and deprive creditors of the right to be heard. The DEBTORS' assertion of their claim of homestead was simply made too late.

■ Having addressed the issues remanded to this Court, one final matter remains for decision. While the appeal of this Court's order denying confirmation was pending before the District Court, the DEBTORS, at the mistaken prompting of this Court, filed an amended plan. The order denying confirmation gave the DEBTORS twenty-one days to file an amended plan consistent with the opinion and, after the notice of appeal was filed, this Court issued a notice and order informing the DEBTORS that if they did not file an amended plan within seven days their case would be dismissed. In response, the DEBTORS filed an amended Chapter 13 plan on March 29, 1994, which provides the following with respect to the CREDIT UNION's mortgage:

> Debtors have alleged that the credit union is entirely unsecured, claiming violations of the Truth in Lending Act and failure of the credit union to obtain their written waiver of their homestead exemption. The bankruptcy court has ruled in favor of the credit union; the debtors have appealed.
>
> If, after appeal, the court finds that the credit union is unsecured, or that violations of the Truth in Lending Act have occurred, or that the debtors have a valid claim of homestead in their Abingdon residence, then the debtors do not propose to pay the credit union anything on the mortgage note (which they did not sign). However, if the court finds that the credit union's mortgage is valid, and that the Debtors' TIL, homestead and other defenses are invalid, then the debtors intend to continue litigation in state court.

The CREDIT UNION filed an objection to the amended plan, asserting that the plan did not comply with this Court's opinion and order because the DEBTORS did not propose to pay the CREDIT UNION the full amount of its secured claim. A hearing was held on May 6, 1994. Under the terms of the amended plan, the DEBTORS proposed to pursue the litigation in state court if they are unsuccessful on the appeal, while continuing under the Chapter 13 plan in this Court. The DEBTORS contend that if the CREDIT UNION obtains relief from the stay prior to a final adjudication of the issues in the federal court system, they will not be barred from relitigating those issues in the state court action. The CREDIT UNION took the position that as the DEBTORS failed to file an amended plan in conformity with this Court's order, the stay should be lifted. The Court took the matter under advisement, but by an order entered May 26, 1994, deferred ruling upon the amended plan until a decision was rendered in the appeal.

The amended plan filed by the DEBTORS is not confirmable. By its previous Opinion and Order, this Court·determined that the DEBTORS could not rescind the mortgage and that even though the DEBTORS were not personally liable, the CREDIT UNION held a secured claim in this Chapter 13 proceeding which could not be bifurcated. The purpose of a Chapter 13 case is to repay creditors in accordance with the provisions of that chapter. Its purpose is not to hold creditors at bay. The DEBTORS cannot reap the benefits of a Chapter 13 discharge while holding the CREDIT UNION at bay throughout the duration of the plan while the litigation unfolds in this forum, only to return to the state court if they ultimately lose here. If the DEBTORS wanted to litigate in state court they could have stayed there. Instead they elected to remove the litigation to Bankruptcy Court as part of their Chapter 13 case. Under § 1325(a)(5) of the Bankruptcy Code the DEBTORS must treat the claim of the CREDIT UNION as fully secured or surrender the property to the CREDIT UNION. 11 U.S.C. § 1325(a)(5). If their plan is amended to so provide, it is confirmable. If not, then the case should be dismissed with the foreclosure being transferred back to state court.[5]

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

---

5. This was this Court's original finding when in the initial stages of this case it denied the CRED-

IT UNION's motion for abstention and remand.

## ORDER

For the reasons set forth in this Court's Opinion filed in this case on December 29, 1993, and this Court's Opinion on remand entered this day; IT IS HEREBY ORDERED:

1. The DEBTORS are precluded from asserting a claim of homestead against the CREDIT UNION;

2. Confirmation of the DEBTORS' amended plan filed March 29, 1994, is hereby DENIED; and

3. The CREDIT UNION's objection to confirmation of the amended plan is ALLOWED, and DEBTORS are given twenty-one (21) days within which to amend their plan to be consistent with this Opinion. If they fail to do so, their Chapter 13 case will be dismissed and the mortgage foreclosure action will be remanded to state court for further proceedings in that court. If they do so, the mortgage foreclosure action will be stayed as to both the DEBTORS and KIMBERLY.